NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 10-3494
_____

UNITED STATES OF AMERICA

v.

SHARRON GRINNAGE,
                              Appellant
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(No. 2:08-cr-101-1)
District Judge:  Honorable J. Curtis Joyner

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
January 24, 2012
_____

Before:  AMBRO, CHAGARES, and HARDIMAN, Circuit Judges.

(Filed June 29, 2012)
_____

OPINION
_____

CHAGARES, Circuit Judge.

Sharron Grinnage appeals four rulings by the District Court relating to his

conviction for being a felon in possession of a firearm in violation of 18 U.S.C.

§ 922(g)(1).  Before Grinnage's jury trial commenced, the District Court denied his

motions to dismiss the indictment for outrageous government conduct, to suppress DNA evidence, and to exclude DNA test results. Grinnage appeals those rulings and also asserts that the District Court improperly counted his prior convictions when concluding that he was a career criminal for sentencing purposes. For the reasons that follow, we will affirm the rulings and sentence of the District Court.[1]

I.

Because we write solely for the parties, we recite only those facts necessary for our decision. The discovery by police that Grinnage was wrongfully in possession of a firearm occurred after the tragic murder of his living partner, Kelly Carter-Hernandez. On January 25, 2007, two armed men forcibly entered the home that Carter-Hernandez and Grinnage shared while Carter-Hernandez was home with her two children. They demanded that Carter-Hernandez give them her money and then one assailant shot her dead. Upon a search of the residence, police found a .38 caliber Smith & Wesson revolver in the master bedroom, along with a digital scale, pink plastic bags, and a single-edge razor blade. The police took DNA samples from the revolver and obtained a warrant to extract DNA cells from Grinnage for comparison. When the DNA comparison produced several matches between Grinnage's DNA and the DNA swabbed from the revolver, prosecutors charged Grinnage with being a felon in possession of a firearm.

II.

---

[1] The District Court had jurisdiction over this case pursuant to 18 U.S.C. § 3231 and we have jurisdiction over the appeal pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

Grinnage's motion to dismiss the indictment was precipitated by the heavy publicity surrounding the murder of Carter-Hernandez and the subsequent trial of six defendants (not including Grinnage). On February 19, 2008, the Mercury newspaper reported that Grinnage had been indicted for being a felon in possession of a firearm. One of the prosecutors involved in this case, Montgomery County Assistant District Attorney Douglas Rosenblum (who was also designated as a Special Assistant United States Attorney), stated in the article that Grinnage was one of the "most dangerous individuals" on the street and was an "armed career criminal" who "possessed this firearm in connection with his drug dealing activities." Joint Appendix ("J.A") 33–34. His comments insinuated that Grinnage was to blame for the murder of Carter-Hernandez:

> It is absolutely certain that drugs breed violence. Had it not been for Mr. Grinnage and his chosen occupation as a drug dealer, Mr. Ramtahal, Mr. Pippen and their co-defendants would not have been in Stowe that day to rob him, and Kelly Carter-Hernandez would still be alive.

J.A. 34.

In response to those statements to the press, Grinnage moved to dismiss the charge against him on the ground that his due process rights were violated by the Government's outrageous conduct. He argued that the press statements prejudiced potential jurors and deprived him of his right to a fair trial. The District Court held that the conduct at issue did not warrant dismissal of the case and denied the motion.

"Because outrageous government conduct, a constitutional claim, is a mixed question of law and fact, we exercise plenary review over the district court's legal

3

conclusions, and review any challenges to the court's factual findings for clear error." United States v. Lakhani, 480 F.3d 171, 181 (3d Cir. 2007) (quotation marks omitted). This Court has been "extremely hesitant to find law enforcement conduct so offensive that it violates the Due Process Clause." Id. at 180 (quotation marks omitted). Thus, Government conduct violates due process only where it is "shocking, outrageous, and clearly intolerable." United States v. Nolan-Cooper, 155 F.3d 221, 231 (3d Cir. 1998) (quotation marks omitted); see United States v. Twigg, 588 F.2d 373, 380–81 (3d Cir. 1978) (dismissing an indictment because the Government informant suggested to the defendants that they establish a laboratory for manufacturing illegal drugs, directed the operation, and supplied the defendants with the location for the laboratory and many of the materials needed to manufacture the drugs).

We agree with the District Court that the outrageous conduct doctrine is inapplicable here. The prosecution's statements to the press did not rise to the level at which we would presume that Grinnage's due process rights were violated. Pretrial publicity has been found to prejudice a defendant where the conviction was "obtained in a trial atmosphere that was utterly corrupted by press coverage." Skilling v. United States, 130 S. Ct. 2896, 2914 (2010) (quotation marks omitted). But "juror *impartiality* . . . does not require *ignorance*." Id. at 2915 (emphasis in original). In the case at bar, the offending article hardly created an atmosphere "utterly corrupted by press coverage." Id. at 2914. It was published almost two years before Grinnage's trial and in only one local newspaper. Furthermore, Grinnage does not allege that any of the jurors in his case actually read the article. Finally, the statements themselves did not rise to the level that

4

would have required a change of venue, even if Grinnage had moved for such a change. See Rideau v. Louisiana, 373 U.S. 723, 725–27 (1963) (finding prejudice due to pretrial publicity because defendant's confession was broadcast on local television and the trial judge refused to order a change of venue). For those reasons, we hold that the District Court's denial of Grinnage's motion to dismiss was proper.

### III.

Grinnage's next contention is that the District Court should have granted his motion to suppress the DNA evidence on the grounds that the warrant was not supported by probable cause. In reviewing the District Court's denial of a motion to suppress, we exercise plenary review over its legal conclusions and review its findings of fact for clear error. United States v. Tracey, 597 F.3d 140, 146 (3d Cir. 2010). "A magistrate judge may find probable cause when, viewing the totality of the circumstances, 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.' " United States v. Hodge, 246 F.3d 301, 305 (3d Cir. 2001) (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)). We "need not determine whether probable cause actually existed, but only whether there was a substantial basis for finding probable cause." Id. (quotation marks omitted).

We conclude that the affidavit upon which the warrant was based set forth a substantial basis for finding probable cause to believe that the firearm found in Grinnage's bedroom belonged to him. The affidavit described the items found at the scene and alleged that Grinnage resided with Carter-Hernandez and had two previous felony drug convictions. Although there was a possibility that the gun belonged to

5

Carter-Hernandez, who was a security officer with access to firearms at her job, there was also a strong probability that it belonged to Grinnage. Thus, we will affirm the District Court's denial of Grinnage's motion to suppress.

IV.

We also hold that the District Court appropriately admitted the DNA evidence and expert testimony without a pretrial Daubert hearing. We review a decision to admit or reject expert testimony for an abuse of discretion. Schneider ex rel. Estate of Schneider v. Fried, 320 F.3d 396, 404 (3d Cir. 2003). Under Federal Rule of Evidence 702 and the Supreme Court's holding in Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 590 (1993), scientific evidence is admissible in federal court only if it is reliable.

Grinnage challenges the reliability of the method of DNA testing employed in this case, which uses polymerase chain reactions of short tandem repeats to analyze extremely small samples of DNA ("the PCR/STR method"). The District Court provided no explanation for its denial of the motion to exclude the DNA evidence. This Court (along with several other state and federal courts) has previously upheld the admission of DNA evidence produced through the PCR/STR method. See, e.g., United States v. Trala, 386 F.3d 536, 541–42 (3d Cir. 2004), vacated on other grounds, Trala v. United States, 546 U.S. 1086 (2006); United States v. Ewell, 252 F. Supp. 2d 104, 111–12 (D.N.J. 2003), aff'd, United States v. Adams, 189 F. App'x 120 (3d Cir. 2006). Grinnage's argument is directed toward a variation of the PCR/STR method. He asserts that the evidence should have been excluded because the lab technician began the PCR/STR protocol with an unusually low amount of DNA, known as "low copy number" ("LCN") or "low

6

template" ("LT") DNA analysis. In this case, the Government's expert witness testified that there are multiple definitions for LCN or LT analysis.[2] Although the Government's expert conceded that all three of the samples were low template, she opined that they were not low enough to cause "stochastic effects and other issues." Transcript of Jury Trial Dec. 9, 2009 at 64, United States v. Grinnage, No. 08-101. This was in part because even though the samples contained more than one profile, Grinnage's full profile was seen within the mixture in each of the three samples.

Grinnage's argument requires us to consider the Government's use of the scientific evidence at trial. The Government relied on the DNA evidence in this case for two purposes: to prove that Grinnage possessed the gun, and to prove that Carter-Hernandez did not. With respect to the first use, Grinnage argued to the jury that because the gun was found in his bedroom, his DNA could have arrived on it through secondary transfer. For example, if Carter-Hernandez or her assailant set the gun down on a surface containing Grinnage's DNA (e.g., because he had touched it or sneezed on it), the gun could have picked some of it up. An expert for the defense testified that such transfer would not be uncommon. The jury was within its purview to disbelieve this innocent explanation, and the verdict reflects that it did.

---

[2] No federal court has had occasion to consider the reliability of LCN testing. See United States v. Davis, 602 F. Supp. 2d 658, 667–72 (D. Md. 2009) (finding that DNA analysis did not qualify as LCN testing because of the quantity of DNA analyzed); United States v. Williams, No. CR 05-920-RSWL, 2009 WL 1704986, at *5 (C.D. Cal. June 17, 2009) (same).

7

We view Grinnage's claim of error to be more substantial with respect to the alternate use of the evidence, that is, to prove that Carter-Hernandez's DNA was not on the gun. LCN testing might be less reliable than the typical PCR/STR method, especially where the proponent of the evidence seeks to prove a negative. This is because stochastic events can lead to phenomena such as "allele dropout," causing part of a profile to disappear. See generally John M. Butler, Forensic DNA Typing 68, 167–70 (2d ed. 2005). Consequently, there may be cases where a Daubert hearing will be necessary to discern a minimum acceptable mass threshold, below which the PCR/STR methodology is unreliable.[3]

But this is not one of those cases. At least one of the samples that positively identified Grinnage began with 0.65 nanograms of genetic material, which while below the minimum of the ideal starting range of 1 nanogram, is still well above a commonly estimated stochastic threshold of 0.1 nanograms identified by the Government's expert and uncontested by Grinnage. With respect to the negative use of the DNA evidence, Grinnage's own expert agreed that Carter-Hernandez could be excluded from the

[3] Whether LCN testing that still utilizes the PCR/STR methodology constitutes a different methodology that is subject to Daubert, as opposed to an iteration of the same basic method that is mere fodder for cross examination, is a difficult question, but one that we need not resolve here. See United States v. Gipson, 383 F.3d 689, 696–97 (8th Cir. 2004) ("[W]hen the application of a scientific methodology is challenged as unreliable under Daubert and the methodology itself is otherwise sufficiently reliable, outright exclusion of the evidence in question is warranted only if the methodology 'was so altered [by a deficient application] as to skew the methodology itself.'" (second alteration in original) (quoting United States v. Beasley, 102 F.3d 1440, 1448 (8th Cir. 1996))); United States v. Shea, 211 F.3d 658, 668 (1st Cir. 2000) (holding it was not an abuse of discretion for the district court to hold that "any flaws in Dr. Deadman's application of an otherwise reliable methodology went to weight and credibility and not to admissibility.").

weapon, even though one of the samples tested showed an unexplained allele that matched Carter-Hernandez, but did not match Grinnage.  Nor did Grinnage's expert testify regarding the problems with or unreliability of LCN testing, Grinnage's principal argument here.  Accordingly, we cannot say the District Court abused its discretion in admitting the evidence.

V.

Finally, we conclude that the District Court correctly counted Grinnage's prior felony convictions.  The District Court held that Grinnage was a career criminal under 18 U.S.C. § 924(e)(1) because, in a prior criminal proceeding, he was convicted of selling or possessing with intent to distribute cocaine on three separate dates.  Grinnage argues that the three incidents do not count as "committed on occasions different from one another," as required by § 924(e)(1), because the sales were to the same informant, in the same manner, in the same location, and were prosecuted together in the same proceeding.

We exercise plenary review of the District Court's application of legal principles at sentencing.  Virgin Islands v. Martinez, 239 F.3d 293, 297 (3d Cir. 2001).  This Court has held that a conviction can constitute a prior conviction for the purposes of career criminal status even where it arose from the same arrest or indictment as other predicate convictions.  United States v. Schoolcraft, 879 F.2d 64, 73–74 (3d Cir. 1989).  The test for separate occasions, known as the "separate episode" test, is temporal and depends on whether the episodes were "distinct in time."  Id. at 73.  We must examine whether the defendant "had sufficient time to cease and desist or withdraw from the criminal activity" after each individual sale.  United States v. Cardenas, 217 F.3d 491, 492 (7th Cir. 2000).

9

Here, Grinnage was convicted for selling or possessing cocaine on three separate dates and certainly had sufficient time in between the sales to "cease and desist or withdraw from the criminal activity." Id.; see United States v. Gray, 152 F.3d 816, 821–22 (8th Cir. 1998) (holding that two convictions for drug trafficking were separate episodes for sentencing purposes because they occurred on different days). We are not persuaded by Grinnage's argument that this case is distinguishable from United States v. Gray on the basis that the defendant in Gray obtained the drugs that he sold from different sources for the two sales for which he was convicted. This Court made clear in Schoolcraft that the key consideration is whether the episodes were "distinct in time." Schoolcraft, 879 F.2d at 73. The fact that Grinnage obtained his drugs from the same source on each occasion is not enough to merge his three sales into one distinct episode. As such, the District Court correctly counted each of Grinnage's prior convictions as separate episodes for the purposes of sentencing.

## VI.

For the foregoing reasons, we will affirm the rulings and sentence of the District Court.

10