

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-15-00294-CR

IVAN LOPEZ-SALAS                                                 APPELLANT

V.

THE STATE OF TEXAS                                                     STATE

----------

### FROM THE 367TH DISTRICT COURT OF DENTON COUNTY
### TRIAL COURT NO. F15-1357-367

----------

## MEMORANDUM OPINION[1]

----------

In five points, Ivan Lopez-Salas challenges his convictions for continuous sexual abuse of a child (Count One) and for two counts of sexual assault (Counts Two and Three). *See* Tex. Penal Code Ann. § 21.02 (West Supp. 2016), § 22.011(a)(2)(A), (C) & (c)(1) (West 2011). We affirm.

----------

[1]*See* Tex. R. App. P. 47.4.

## Background

Appellant lived with the complainant and her family for over six years. When the complainant was fifteen, she made an outcry to her mother that appellant had been sexually abusing her. After the complainant filed a police report and gave a forensic interview at the Child Advocacy Center, the State presented the case to a grand jury, which indicted appellant on one count of continuous sexual abuse and two counts of sexual assault of a child. The evidence at appellant's jury trial—which included the complainant's testimony and DNA test results—showed that appellant repeatedly sexually abused the complainant over a several-year period when she was under the age of fourteen and that he sexually assaulted her at least twice when she was fifteen, resulting in her pregnancy. A jury convicted appellant of one count of continuous sexual abuse and two counts of sexual assault. Appellant does not challenge the sufficiency of the evidence supporting his conviction; instead, he raises voir dire, evidentiary, and charge-related complaints.

## Voir Dire

In his first point, appellant contends the trial court erred by denying his challenge for cause of Juror Nine for "bias." Defense counsel had the following exchange with Juror Nine during his initial questioning of the entire venire panel:

> [DEFENSE COUNSEL]: Do you believe that the child could lie about something like this?
>
> VENIREPERSON: No.

[DEFENSE COUNSEL]: Would it be fair to say that you have a bias against the Defendant because of what he's accused of?

VENIREPERSON: Yes.

**Applicable Law and Standard of Review**

A defendant may challenge a potential juror for cause if he is biased or prejudiced against the defendant or the law on which the State or defendant is entitled to rely. *Comeaux v. State*, 445 S.W.3d 745, 749 (Tex. Crim. App. 2014). A trial judge must excuse the juror if bias or prejudice would impair the juror's ability to carry out his oath and instructions in accordance with the law. *Id.* But before the judge excuses the prospective juror, the law must be explained to him, and the challenger must show that the potential juror understood the law and still could not overcome his prejudice. *Id.*

The proponent of a challenge for cause has the burden of establishing that the challenge is proper. *Gardner v. State*, 306 S.W.3d 274, 295 (Tex. Crim. App. 2009), *cert. denied*, 562 U.S. 850 (2010). The proponent does not meet this burden until he has shown that the veniremember understood the requirements of the law and could not overcome his prejudice well enough to follow the law. *Id.* Because the trial judge is in the best position to evaluate a veniremember's demeanor and responses, we review a trial court's ruling on a challenge for cause with considerable deference, especially when a veniremember's answers are ambiguous, vacillating, unclear, or contradictory, and we reverse only for a clear abuse of discretion. *Id.* at 295–96.

3

**Individual Examination of Juror Nine**

After Juror Nine's initial answer, the trial judge and counsel for the State and appellant questioned him separately from the rest of the panel:

THE COURT: . . . But I know that one question that is always important in a case is, is to make sure that any biases or prejudice that we bring into the courtroom --

VENIREPERSON: Uh-huh.

THE COURT: -- we need to know can we set them aside and hear evidence only as it comes from the witness stand or documents admitted into evidence.

And so, that's one of the questions that -- that I have is: Everybody has a bias, we all bring them in here --

VENIREPERSON: Uh-huh.

THE COURT: -- but are you able to actually set any biases you may -- you may have against, say, either this individual Defendant or the type of charge that he has and listen to the evidence as it comes from the witness stand or documents admitted into evidence and make your decisions solely on that, or are you going bring your own experiences in from outside the courtroom?

VENIREPERSON: No. I don't think I could set them aside with the type of charges.

THE COURT: Okay.

VENIREPERSON: As a person, I don't think -- that's why I don't think I can set that aside for that low -- the type of charges, no, definitely not. There -- there's no way, especially with what he was talking about earlier with the minimum of probation and no charge -- not -- would not be able to do that.

THE COURT: Okay.

Any questions?

[STATE]:  I mean -- and I -- I guess my question is to you -- and it's okay to feel that way --

VENIREPERSON:  Yeah.

[STATE]: -- obviously. The -- coming from my perspective, No. 1, you don't know Mr. Lopez-Salas --

VENIREPERSON: Uh-huh.

[STATE]:  -- no evidence has been presented against him, right?

VENIREPERSON:  Correct.

[STATE]:  Correct?

And so, you know, what Mr. Lo- -- what the law demands that he gets is a fair trial; and we bring in people from the community such as yourself.

VENIREPERSON: Uh-huh.

[STATE]:  So, my question to you is:  How am I going to seat a jury to give this man a fair trial?  I'm not -- you know, is there -- and I'm not trying to get too ultra personal --

VENIREPERSON: Uh-huh.

[STATE]:  I know you have children.  That's fine.  I have children, and the thought of it sends me into a rage even just considering it.[2]

VENIREPERSON:  Yes.

---

[2]In his brief, appellant appears to argue that this comment by the prosecutor necessitates reversal because it was designed and calculated to inflame Juror Nine's pre-existing bias.  Although appellant did not object to this comment on that ground in the trial court—specifically stating that he did not think the comment was intentional—he did include it as a reason for seeking an extra strike, which the trial court denied.  *See* Tex. R. App. P. 33.1(a)(1).

5

[STATE]: But being able to set that aside, to hear his case and the evidence -- once you hear evidence; and you believe that evidence is credible --

VENIREPERSON: Uh-huh.

[STATE]: -- then you follow the law. The law then demands that you find guilty, if the State meets its burden of proof.

VENIREPERSON: Yeah.

[STATE]: And the law demands that you sentence them appropriately if the facts justify it and the law allows it.

VENIREPERSON: Uh-huh.

[STATE]: So, it's okay to be even angry about a charge. It's okay to have --

. . . .

[STATE]: -- it's okay to have a bias about a -- a feel -- you know, to -- there is not one person I -- I think on this earth, other than sex offenders, who would think that actions like this are okay.

VENIREPERSON: Uh-huh.

[STATE]: So, my question to you, going along with what the Judge was saying, is: Can you set those strong feelings aside and mean – meaning that, if I don't prove one of my elements --

VENIREPERSON: Uh-huh.

[STATE]: -- if I don't prove that it happened in Denton County, that you -- the law then demands that you would find him not guilty because I did not meet all my evidence.

VENIREPERSON: Uh-huh.

[STATE]: Is that something that you could do in this case?

VENIREPERSON: Yes.

6

[STATE]:  And not just along those lines, but setting aside those strong feelings giving both the State of Texas and Ivan Lopez-Salas a fair trial based on the evidence that is admitted and -- you know, to you in this courtroom?

VENIREPERSON:  Yes.  I -- yeah -- believe so, yeah. I guess.

[STATE]:  Okay.

I'll -- I'll pass the juror.

THE COURT: Any questions?

[DEFENSE]:  Yes, please.

[Juror 9], you had said earlier that you'd have a bias against --

VENIREPERSON:  Uh-huh.

[DEFENSE]:  -- the Defendant.  You still do, don't you?

VENIREPERSON:  *In the sense of that I'm -- for what he's charged with?  Yes.*

*I have a problem with no type of justice in that situation of guilty/not guilty.  That's the only real -- you know -- bias I would have against the whole thing.*  So . . .

[DEFENSE]:  You cannot consider the full range of punishment against him?

VENIREPERSON:  Not -- not if guilty, no.  I wouldn't -- no, I couldn't.

[DEFENSE]:  Pass the juror, Judge.

THE COURT:  Anything --

[DEFENSE]:  Yes.

THE COURT: -- more?

[STATE]:  Just briefly because I didn't go into it.

7

When we -- when we talk about punishment ranges in offenses --

. . . .

[STATE]: -- we're not talking about any specific acts by this person.

VENIREPERSON: Yes.

[STATE]: We're talking about the laws that our legislature has given us.

VENIREPERSON: Uh-huh.

[STATE]: And so, with that being said, the offense of -- now that -- the first offense that Ms. Molsbee talked about, probation's not an option. The punishment range is from a minimum of 25 years up to life in prison.

VENIREPERSON: Okay.

[STATE]: You under -- do you understand that?

VENIREPERSON: Now I do, yes. I figured it was the other one. Okay.

[STATE]: Because there's actually -- the indictment against Mr. Lopez-Salas has three counts to it. The first count -- and each count is like a separate case.

VENIREPERSON: Uh-huh.

[STATE]: And so, the first count is continuous sexual abuse, and the punishment range is a minimum of 25 years in prison, no parole; up to life in prison, no parole.

*Could you follow that punishment range?*

VENIREPERSON: *Yes.*

[STATE]: Meaning that you could consider the full range if he's found guilty and applying the, you know, evidence to the law and coming to a -- to a result?

VENIREPERSON: Yeah, I -- yes. Yes.

[STATE]: Meaning -- and – and meaning that if the facts justify it and, the law allows it, you could consider a punishment within that full range?

VENIREPERSON: Yes.

[STATE]: Now, moving on.

There's two counts of sexual assault.

VENIREPERSON: Okay.

[STATE]: And sexual assault is a much -- has a much, much broader punishment range. A minimum of five years' probation up to a maximum of life in prison.

Do you understand . . . that punishment?

VENIREPERSON: Yes, I do.

[STATE]: And now, with regards to sexual assault there are -- the punishment range is that broad because there's actually that broad of an amount of things that can qualify as a sexual assault.

Does that --

VENIREPERSON: Okay.

[STATE]: Does that make sense?

VENIREPERSON: That makes sense, yes.

[STATE]: Because you can sexually assault somebody by -- and I am just going use examples and use pronouns -- you can sexually assault somebody by touching their genitals with your hand.

VENIREPERSON: Uh-huh.

9

[STATE]: By penetrating their genitals with your hand, no matter how slight that intrusion is, it would be considered penetration; and it could be considered sexual assault.

The age range for sexual assault of a child that we have in this case is where the -- the person is younger than 17 years of age. So it's a little higher. So, that's the reason that's -- all of those together are the reason the punishment is so broad.

VENIREPERSON: Okay.

[STATE]: What we asks our -- ask our jurors to do means this: That if you go back and, you find Mr. Lopez-Salas, or any Defendant that you were on jury duty for, you find them guilty of the offenses charged.

What we're asking is: Is that as soon as you find them guilty that doesn't mean that, oh, I won't consider probation. It just means that prior to hearing all the evidence, you won't have already prejudged him or come to a decision.

Does that make sense?

VENIREPERSON: That makes sense, yes.

[STATE]: Now, based on the evidence that's presented to you in the case-in-chief -- "guilty/not guilty" is what we call that -- and in the punishment phase, in your opinion, you may think that probation is not the appropriate punishment.

VENIREPERSON: Correct.

[STATE]: And that's okay, too. Just -- we can't have you standing here on Monday afternoon saying, there's no set of facts anywhere in the universe where I would consider giving somebody probation.

*All that -- that -- that just means that my mind isn't shut off. My mind will be open. I will hear the evidence; and then upon hearing that evidence, I will then make a decision based -- if the facts justify it and the law allows it, I'll make a decision within that punishment range.*

10

*Is that something that you could do?*

VENIREPERSON: *Yes.* [Emphasis added.]

The trial court denied the challenge.

**Trial Court Did Not Abuse Its Discretion**

Appellant preserved his complaint about Juror Nine by asserting a clear and specific challenge for cause, using a peremptory challenge on Juror Nine, exhausting his peremptory challenges, requesting additional strikes that were denied, and identifying an objectionable juror that sat on the jury. *See Comeaux*, 445 S.W.3d at 749. Although Juror Nine stated initially that he was biased against appellant, he clarified after further questioning that he had problems with giving probation to someone who had been found guilty of sexual offenses against a child. He later admitted in response to the State's questioning that he could follow the range of punishment for both the continuous sexual abuse and sexual assault offenses. Thus, appellant did not meet his burden to show that Juror Nine, although understanding the requirements of the law, could not overcome his prejudice well enough to follow that law. *See id.* We therefore overrule appellant's first point.

**Admissibility of Accusation of Prior Abuse**

In his second point, appellant argues that the trial court abused its discretion by refusing to allow him to question the complainant about a statement she made during the investigation of her outcry against appellant that she had

11

been the victim of sexual acts by a family member when she was five years old. Appellant contends that he should have been allowed to question the complainant about this statement to show that she had accused three different men of sexually assaulting her and to explain or rebut evidence that while a physical examination of the complainant did not reveal any injuries, she claimed appellant was the only one who sexually assaulted her.

When defense counsel asked the complainant on cross-examination whether her mother had ever taken her to a doctor for a well-child checkup, the complainant answered, "I remember one time I told her that somebody had already touched me. And after that, she took me and she said that I was a liar because the doctor said that I hadn't been touched by nobody." After questioning the complainant further about other matters, defense counsel questioned her on voir dire outside the jury's presence. When asked about the family-member allegation, the complainant answered that when she was five years old, a family member put his penis between her legs but did not penetrate her sexual organ. Shortly after these events occurred, this family member left the country for Mexico where he had remained for "years," according to the complainant. The complainant did not tell anyone about what that family member did to her until 2013 when she made an outcry against appellant after she became pregnant. The trial court denied appellant's request to question the complainant about this statement before the jury.

12

Appellant contends that he should have been allowed to question the complainant about this statement (1) under the rule of optional completeness to refute the complainant's testimony that in a forensic interview and police interview she consistently identified appellant as the perpetrator of the continuous sexual abuse and sexual assault offenses and (2) under rule 412(b)(2)(A) to rebut a sexual assault nurse examiner's testimony that the complainant showed no evidence of physical trauma. *See* Tex. R. Evid. 107 (providing that if a party introduces part of a conversation or recorded statement, an adverse party may inquire into any other part on the same subject or "any other act, declaration, conversation, writing, or recorded statement that is necessary to explain or allow the trier of fact to fully understand the part offered by the opponent"), 412(b)(2)(A) (providing that evidence of a victim's past sexual behavior is not admissible except, among other things, if "necessary to rebut or explain scientific or medical evidence offered by the prosecutor").

The rule of optional completeness "is designed to reduce the possibility of the jury receiving a false impression from hearing only a part of some act, conversation, or writing." *Walters v. State*, 247 S.W.3d 204, 218 (Tex. Crim. App. 2007). Thus, for the omitted part of a statement or conversation to be admissible under rule 107, its proponent must show that it is "on the same subject" and "necessary to make it fully understood." *Sauceda v. State*, 129 S.W.3d 116, 123 (Tex. Crim. App. 2004) (op. on reh'g) (quoting Tex. R. Evid.

13

107).  In other words, the omitted part must be necessary to place the admitted part in its proper context.  *See id.*

Appellant contends that the complainant's accusation against her family member is not a collateral matter and, thus, is admissible under rule 107 because it shows that she had "accused" three different people.  But the record does not support appellant's assertion.  The complainant did not accuse her family member of committing any of the conduct she attributed to appellant; she testified that the family member had touched her sexually when she was five years old and that the acts of which she accused appellant did not begin until several years later, when she was nine years old and in the fourth grade.  Also, contrary to appellant's assertions at trial, there is no evidence that the complainant ever accused her boyfriend of sexual assault; although she admitted initially lying to her father and telling him that "a boyfriend" had impregnated her, she also said she never gave her father a name of a boyfriend, and she denied having sex with the boy she was dating at the time she became pregnant.  That former boyfriend also testified at trial and denied having a sexual relationship with the complainant.  The complainant never named a specific person other than appellant as being responsible for the sexual abuse occurring during the times alleged in the indictment.  Thus, we conclude and hold that this evidence was not on the "same subject" and therefore it was not admissible under rule 107.  *See Estrada v. State*, 352 S.W.3d 762, 769 (Tex. App.—San Antonio 2011,

14

pet. ref'd), *cert. denied*, 135 S. Ct. 212 (2012); *Reynolds v. State*, 856 S.W.2d 547, 550 (Tex. App.—Houston [1st Dist.] 1993, no pet.).

Likewise, appellant's argument that the evidence was admissible under rule 412(b)(2)(A) fails.  Appellant contends that because a sexual assault nurse examiner did not observe any physical trauma to the complainant, her statement about the prior abuse by a family member is admissible to refute the complainant's testimony that appellant was the only one who touched her sexually.[3]  That the complainant had been a victim of a nonpenetration touching offense when she was a five-year-old is not necessary to rebut a nurse's observation ten years later that she observed no signs of physical trauma when examining the complainant.  *See Wheeler v. State*, 79 S.W.3d 78, 86  (Tex. App.—Beaumont 2002, no pet.); *Marx v. State*, 953 S.W.2d 321, 337 (Tex. App.—Austin 1997), *aff'd*, 987 S.W.2d 577 (Tex. Crim. App.), *cert. denied*, 528 U.S. 1034 (1999).

Accordingly, we overrule appellant's second point.[4]

---

[3]We note that, contrary to appellant's assertion, the complainant did testify before the jury that she had told her mother that someone had touched her before and that her mother did not believe her.

[4]Even if we were to construe appellant's point so broadly as to encompass a complaint that the evidence should have been admissible to show fabrication, we nevertheless do not conclude that the trial court abused its discretion by refusing to admit it.  *See, e.g., Johnson v. State*, 490 S.W.3d 895, 909–10 (Tex. Crim. App. 2016).

## Admissibility of Detective's Testimony

In his third point, appellant contends the trial court abused its discretion by allowing the investigating detective to offer an opinion as to the complainant's credibility by answering the State's question of whether her story had remained consistent.

During the State's direct examination of Detective Richard Crociata, the following exchange occurred:

> Q. Has -- at all times has her story been consistent?
>
> A. Yes, ma'am.
>
> Q. What was your impression of [the complainant]?
>
> [DEFENSE COUNSEL]: Your Honor, I object to this witness giving an opinion as to the ultimate issue -- the ultimate fact issue for the State. He's giving an opinion that's bolstering. I object under Rule 403 and 611 and also Rule --
>
> . . . .
>
> Your Honor, I object under Rule 403, 611, 401, and 402.
>
> THE COURT: Well, I'm going to sustain the objection. Just rephrase your question.
>
> Q. . . . She -- she's never changed her story?
>
> [DEFENSE COUNSEL]: Your Honor, I'll object to that as well and the same objection as previously stated.
>
> THE COURT: I'll overrule that objection.
>
> You can answer that question.
>
> A. Her story has been consistent, yes.

16

Appellant contends on appeal that Detective Crociata's testimony that the complainant was consistent in her version of events was the "functional equivalent" of expert testimony that the complainant was being truthful. Although a witness may not give a direct opinion of a complainant's truthfulness, *see Lopez v. State*, 343 S.W.3d 137, 140–41 (Tex. Crim. App. 2011), we agree with the courts that have held that a witness's testimony that a child complainant's statements were consistent over time—without giving an opinion as to the significance of that consistency—does not constitute an inadmissible direct opinion on that witness's truthfulness. *See, e.g., Matamoros v. State*, No. 13-13-00692-CR, 2015 WL 6759331, at *10 (Tex. App.—Corpus Christi Apr. 13, 2016, pet. ref'd) (mem. op., not designated for publication); *Dauben v. State*, No. 10-13-00044-CV, 2014 WL 2566469, at *2 (Tex. App.—Waco June 5, 2014, pet. dism'd, untimely filed) (mem. op., not designated for publication); *Verdun v. State*, No. 14-08-00864-CR, 2010 WL 183523, at *1–5 (Tex. App.—Houston [14th Dist.] Jan. 21, 2010, pet. ref'd) (mem. op., not designated for publication); *cf. Burns v. State*, 122 S.W.3d 434, 437 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd) (holding that expert witness's testimony that psychological test results suggested that complainant was answering questions in an open, nondefensive, and truthful manner was not direct opinion of complainant's truthfulness). *But cf. Flores v. State*, No. 14-15-00754-CR, 2016 WL 6990053, at *11 (Tex. App.—Houston [14th Dist.] Nov. 29, 2016, pet. ref'd) (concluding that doctor directly commented on complainant's truthfulness by opining that consistency of child's

17

history in child's own words was most important piece of evidence in determining whether child had been sexually abused).

Even if Detective Crociata's testimony could be construed as commenting directly on the complainant's truthfulness, we conclude that appellant's complaint was not timely. Although appellant objected to this question the second time it was asked, he did not object to it the first time it was asked; thus, any error by the trial court in overruling the objection the second time was harmless. *See Johnson v. State*, 977 S.W.2d 725, 728 (Tex. App.—Fort Worth 1998, pet. ref'd) (op. on reh'g); *see also* Tex. R. App. P. 33.1(a)(1); *Ethington v. State*, 819 S.W.2d 854, 858 (Tex. Crim. App. 1991) ("The objection must be timely; that is, the defense must have objected to the evidence, if possible, before it was actually admitted. If this was not possible, the defense must have objected as soon as the objectionable nature of the evidence became apparent and must have moved to strike the evidence, that is, to have it removed from the body of evidence the jury is allowed to consider."). Accordingly, we overrule appellant's third point.

### Admissibility of DNA Evidence

Appellant's fourth point complains about the admission of DNA evidence establishing his paternity of the complainant's child over his objection that the State's expert's testimony was not reliable under rule of evidence 702. Tex. R. Evid. 702. Specifically, appellant challenges the reliability of the FBI population database that the expert used in interpreting the results of the DNA test because

18

the FBI had issued a bulletin in 2015 indicating it had found errors in the database.

**Standard of Review and Applicable Law**

As with other evidentiary complaints, our review of a trial judge's decision to admit expert testimony is reviewed for an abuse of discretion and may not be reversed unless outside the zone of reasonable disagreement. *See Blasdell v. State*, 470 S.W.3d 59, 62 (Tex. Crim. App. 2015). Rule 702 governs the admissibility of expert evidence and provides that such a witness must be properly qualified and that her testimony must be both relevant and reliable. *See* Tex. R. Evid. 702; *Blasdell*, 470 S.W.3d at 62. When determining whether scientific evidence is reliable, the trial court must consider whether (1) the underlying scientific theory is valid, (2) the technique applying the theory is valid, and (3) the technique was properly applied on the occasion in question. *Hartman v. State*, 946 S.W.2d 60, 62–63 (Tex. Crim. App. 1997) (citing *Kelly v. State*, 824 S.W.2d 568 (Tex. Crim. App. 1992)); *see Blasdell*, 470 S.W.3d at 63 (noting that courts distinguish between hard and soft sciences in reviewing reliability).

The proponent must demonstrate the reliability of such testimony by clear and convincing evidence. *Kelly*, 824 S.W.2d at 573. The court of criminal appeals has held that

> Once a scientific principle is generally accepted in the pertinent professional community and has been accepted in a sufficient number of trial courts through adversarial *Daubert/Kelly* hearings, subsequent courts may take judicial notice of the scientific validity

(or invalidity) of that scientific theory based upon the process, materials, and evidence produced in those prior hearings.

Similarly, once some courts have, through a *Daubert*/*Kelly* "gatekeeping" hearing, determined the scientific reliability and validity of a specific methodology to implement or test the particular scientific theory, other courts may take judicial notice of the reliability (or unreliability) of that particular methodology.

Trial courts are not required to re-invent the scientific wheel in every trial. However, some trial court must actually examine and assess the reliability of the particular scientific wheel before other courts may ride along behind. Some court, somewhere, has to conduct an adversarial gatekeeping hearing to determine the reliability of the given scientific theory and its methodology.

*Hernandez v. State*, 116 S.W.3d 26, 28–29 (Tex. Crim. App. 2003) (footnotes omitted).

### *Daubert/Kelly* Hearing and Expert's Trial Testimony

Christina Capt, a forensic DNA analyst and technical leader for the University of North Texas Center for Human Identification, testified at a *Daubert/Kelly* hearing outside the jury's presence. At the time of trial, she had been a forensic analyst for fourteen and one half years. Capt testified that in making the DNA comparison in this case, she used short tandem repeat (STR) testing, which compares markers within DNA that do not code for anything and thus are "highly variable between individuals" and that are "repeated over and over in a side by side or tandem fashion." Making a comparison involves counting the number of repeats. Capt testified that STR is a widely accepted technology in her field and that she did not know of a crime laboratory that did

20

not use it. She had testified in court many times and had been found to be an expert on DNA analysis.

Defense counsel questioned her about a May 2015 alert from the FBI indicating "that they had discovered errors that . . . forensic scientists had used for DNA analysis":

> Q. . . . . And is it true that the FBI indicated that there were problems that stemmed from clerical mistakes and transcriptions of genotypes and the limitations of the old technology and the old software?
>
> A. Yes.
>
> Q. Is it true that private researchers and lawyers have for many years wondered -- or wanted to be able to get independent analysis of that database information from the FBI?
>
> A. That, I don't know. It's my understanding that this is a published database that is available --
>
> Q. But the data --
>
> A. -- *(overlapping)* for review.
>
> Q. -- the database is available for private research?
>
> A. That, I do not know. . . .
>
> Q. And the crime lab analysis that you do and everybody does in the United States develops out of a DNA profile by analyzing 13 specific loci on chromosomes?
>
> A. Yes, 13 to 15 genetic loci.
>
> Q. And now the FBI is wanting to go to 20 loci, not 13 . . . .
>
> A. (*Overlapping*) That is correct, yes.

Q. And the reason they want to go to 20 loci instead of 13 is, you know, for accuracy?

A. Not so much for accuracy. It's to -- because of the increasing number of samples in the CODIS database that -- and the need for familial searching, that expanding this core marker set will allow them greater accuracy in doing kinship-type comparisons and minimizing the chance of an adventitious hit.

But it's not that the original 13 aren't accurate; it's that this will give them even greater discrimination power and a database that's growing rapidly and to be able to do familial searching.

Q. All right. And so the FBI, when they did their own internal audit, they took 1100 profiles. And they found 33 errors, didn't they?

A. That sounds about right, but I would have to review exactly to determine the number.

Q. All right. So the intention is the FBI is going to establish new criteria and new software, correct?

A. Not new software. They have already issued the updates, and those are already in place in most laboratories, including my own.

Q. Okay. When did you implement those?

A. Early June 2015.

Q. And so were they used on the analysis in this case?

A. They were used on the second report but not the first report.

Q. And the second report, did that involve my client?

A. Yes, it did.

. . . .

Q. All right. And so the FBI recently updated the population database?

22

A. Yes.

Q. And it included a minor modification of the allele frequencies used to generate their statistics?

A. Yes.

Q. And this was reported -- I guess this went into effect July 15th, 2015?

A. Well, they issued the update for the population database, I believe, in May. But, yes, the publication came out in July 2015, but they let us know sooner than that.

. . . .

Q. . . . . Now, is a coincidental match to a DNA database possible?

A. I -- yes.

Q. And what is the probability of a coincidental match?

A. Well, it would determine -- depend on a large number of factors: the number of loci, the discrimination power of those loci. I can't give you a -- a specific figure.

Q. Have you ever examined the FBI's DNA database yourself?

A. No, I have not.

Q. Have you ever examined the Texas DNA database yourself?

A. Are you talking about the Texas CODIS database?

Q. Yes.

A. I am allowed to upload samples, and I can see the samples that our laboratory contributed. But, no, I'm not allowed to see all the samples in the State DNA database.

23

Q. So how big does the database have to be before you would expect more than a 50 percent chance of a match between two profiles in either of those databases?

A. Repeat the question.

Q. So how big does the database have to be before you would expect more than a 50 percent chance of a match between two profiles in the database?

A. Well, again, that's going to depend on a large number of factors. Are you talking about 13 core loci?

Q. Well, the answer would be --

A. Searching 13 core loci?

Q. The answer would be 65,493, wouldn't it?

A. I don't know. That does not sound correct.

. . . .

Q. All right. Is it possible that there are forensic DNA errors?

A. Forensic DNA errors in DNA reports, you're saying?

Q. Statistically?

A. Well, I don't know statistically, but, you know, there's – there's always a possibility for an error.

Q. Interpretive errors?

A. It's possible. You put many procedures in place to prevent that, but it is possible.

Q. Contamination errors?

A. It's possible.

Q. Have you ever made a mistake?

A.  Yes, I have.

Before the jury, Capt testified in more detail about the testing process, indicating that after the DNA from one or more alleged fathers was shown not to be excluded as a possible biological father, she would then "calculate some statistics to support the inclusion," using the FBI laboratory database.  She explained that she generated two reports in this case and that the second report was necessary because an additional alleged father was tested and because the FBI's database statistics had been updated.  According to Capt,

> We use the database provided by the FBI laboratory.  So this database was initially developed in 1999. And since then, actually very recently, the FBI has retested these samples with today's technology and with additional loci.  And when they did that, they noticed that there were a few errors.
>
> So they issued some minor revisions to this database.  They sent out notices to all the laboratories.  All the laboratories were then in charge of quickly performing performance checks on that database.  And now before we go to court, we will recalculate those statistics with the revised database.
>
> . . . .
>
> . . . . Any . . . case going to court, we are issuing updates. The revisions are only expected to change the numbers, you know, to -- to a certain degree.  So we're either doing it upon request for old cases or any case going to court, and we use the new database, of course, for any cases being issued from this point forward.

Also, according to Capt, when considering the new FBI statistics in any case, "the numbers may increase or they may decrease. . . .  They're not going to change by much, but they . . . will change."

25

Capt further testified that a second analyst reviewed her report, including the results, statistics, and content.

Defense counsel questioned Capt again about the database errors, which she characterized as "minor."[5]  Regarding access to the databases, Capt testified as follows:

> Q.  And so the government has had this database under their control the whole time, haven't they?
>
> A.  Yes.
>
> Q.  And private researchers have never been allowed to get access to that database to check what the government is doing with the database, correct?
>
> A.   Well, the population data is published, so the allele frequency data is for public review and it did undergo scientific peer review when it was published in 1999.
>
> As far as the actual samples, yes, to my knowledge, the public does not have access to the actual samples or the data used.

---

[5]The State offered the second report during its case-in-chief, and the defense offered the first report during its cross-examination of Capt.  For comparison, the first report calculated the probability of appellant's paternity as (1) 99.999999996% as compared to an "untested, randomly chosen person of the Caucasian population," (2) 99.9999999997% as compared to an untested, randomly chosen person of the African-American population, and (3) 99.999999996% as compared to an untested, randomly chosen person of the Southwestern Hispanic population.  The second report, which was generated with the corrected database and updated software, calculated the probability of appellant's paternity as (1) 99.99999998% as compared to an untested, randomly chosen person of the Caucasian population, (2) 99.999999998% as compared to an untested, randomly chosen person of the African-American population, and (3) 99.99999998% as compared to an untested, randomly chosen person of the Southwestern Hispanic population.

Q. And you have never seen the FBI database yourself, have you?

A. The population data? Because there's two different databases. There's the CODIS database, and then there's a population data. So that --

Q. (*Overlapping*) Which -- which one have you seen?

A. I have only seen the publication of the population data.

Q. And that is what the government says it is, correct?

A. Yes, and what has been published and a peer reviewed scientific journal, apart from the government.

Q. And the scientific community's been calling on the government to open up the database for private research, haven't they?

A. I'm -- I'm not sure.

**DNA Expert Reliable**

Numerous courts have held that DNA testing technology, including STR and its variations, is reliable. *See U.S. v. Grinnage*, 486 F. App'x 325, 329 (3rd Cir.), *cert. denied*, 133 S. Ct. 459 (2012); *U.S. v. Gipson*, 383 F.3d 689, 697 (8th Cir. 2004); *Stogner v. Cain*, No. 05-4317, 2008 WL 269078, at *10–14 (E.D. La. Jan. 30, 2008); *Roberson v. State*, 16 S.W.3d 156, 166 (Tex. App.—Austin 2000, pet. ref'd) ("Nearly all the cases we have examined in our research, both published and unpublished, have found the DNA identification evidence reliable and relevant and thus admissible in evidence . . . .").

Although acknowledging the widespread acceptance of DNA evidence as reliable, appellant nevertheless contends that Capt's testimony is unreliable

because the FBI database she referenced in performing her analysis is "not reviewable by the scientific community." Appellant contends that Capt's "rote reliance" upon these databases renders her testimony a mere "ipse dixit" opinion. This complaint was preserved via appellant's specific rule 702 objections during the gatekeeper hearing, which he renewed when the DNA evidence was admitted. *See Bekendam v. State*, 441 S.W.3d 295, 300–01 (Tex. Crim. App. 2014).

Contrary to appellant's assertions, Capt testified that the population FBI database is publicly available and has been peer-reviewed. Moreover, regardless of any errors that may have influenced the first report in this case, Capt unequivocally stated that she had been made aware of those errors, that they had been addressed in her laboratory, and that the second report was based on the corrected database. Accordingly, as other courts have done in the face of similar arguments, we conclude and hold that the trial court did not abuse its discretion by finding her testimony reliable and admitting it. *See Barber v. State*, No. 05-12-01159-CV, 2014 WL 117419, at *1–2 (Tex. App.—Dallas Jan. 13, 2014, no pet.) (mem. op., not designated for publication) (concluding State had presented "ample evidence" that FBI DNA database yielded accurate and reliable calculations); *Jessop v. State*, 368 S.W.3d 653, 671 (Tex. App.—Austin 2012, no pet.) (holding DNA expert's testimony reliable when she testified, among other things, "that the FBI database used in calculating the probability of exclusion, paternity indexes, and combined paternity index is used by labs

28

throughout the country and that the use of the FBI database is accepted within the scientific community"); *Fanniel v. State*, No. 01-00-00732-CR, 2002 WL 467158, at *6 (Tex. App.—Houston [1st Dist.] Mar. 28, 2002, pet. ref'd) (not designated for publication) (overruling challenge to reliability of FBI database utilized for DNA analysis even though analyst did not personally test database for accuracy when he testified that "he was aware the database was scrutinized and accepted by the scientific community").

We overrule appellant's fourth point.

## Court's Charge

In his fifth and last point, appellant urges that he suffered egregious harm because of unobjected-to error in the court's charge. According to appellant, the charge potentially allowed the jury to convict him of Counts Two and Three based on the same conduct underlying the offense in Count One.

"[A]ll alleged jury-charge error must be considered on appellate review regardless of preservation in the trial court." *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012). In our review of a jury charge, we first determine whether error occurred; if error did not occur, our analysis ends. *Id.* If error occurred, whether it was preserved determines the degree of harm required for reversal. *Id.* Unpreserved charge error warrants reversal only when the error resulted in egregious harm. *Nava v. State*, 415 S.W.3d 289, 298 (Tex. Crim. App. 2013); *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op.

29

on reh'g); *see* Tex. Code Crim. Proc. Ann. art. 36.19 (West 2006). We need not review for egregious harm in this case because we hold that there was no error.

The continuous sexual abuse statute, penal code section 21.02, provides that a person commits the offense if "during a period that is 30 or more days in duration, the person commits two or more acts of sexual abuse, regardless of whether the acts of sexual abuse are committed against one or more victims," and "at the time of the commission of each of the acts of sexual abuse, the actor is 17 years of age or older and the victim is a child younger than 14 years of age." Tex. Penal Code Ann. § 21.02(b). The jury is not required to agree unanimously on the specific underlying acts of sexual abuse or the exact date those acts were committed; instead, it must agree unanimously that the defendant, during a period of 30 days or more in duration, committed two or more acts of sexual abuse. *Id.* § 21.02(d). The court of criminal appeals has held that the acts of sexual abuse underlying the offense are lesser-included offenses and that "the Legislature clearly intended to disallow dual convictions for the offense of continuous sexual abuse and for offenses enumerated as 'acts of sexual abuse' *when based on conduct against the same child during the same period of time.*" *Price v. State*, 434 S.W.3d 601, 605–06 (Tex. Crim. App. 2014) (emphasis added). Thus,

> [a] defendant charged with continuous sexual abuse who is tried in the same criminal action for an enumerated offense based on conduct committed against the same victim may not be convicted for both offenses unless the latter offense occurred outside the period of time in which the continuous-sexual-abuse offense was committed.

30

*Id.* at 606.

Appellant contends that because of the dates alleged in the charge, the jury could have convicted him on Count One for the same conduct alleged in Counts Two and Three. Thus, according to appellant, the conviction for Count One is a bar to convictions for Counts Two and Three, and those two convictions violate double jeopardy. Appellant claims that the charge failed to state "that the offenses in Counts II and III were for a different time than that in Count I."

Reviewing the pertinent parts of the charge in context, we conclude and hold that there was no danger the jury convicted appellant in Counts Two and Three based on the same conduct that it found in Count One:

> As to Count I of the Indictment, you are charged as the law that the State is not required to prove the exact dates alleged in the Indictment. However, all acts of sexual abuse, if any, that form the basis of the offense of Continuous Sexual Abuse of a Young Child, *must have occurred on or after September 1, 2007, and before the 14th birthday of [the complainant] and before June 26, 2015*, the presentment date of the indictment.

> <u>COUNT I</u>

> Now, if you find from the evidence beyond a reasonable doubt that during a period that was 30 days or more in duration, to wit: *from on or about the 1st day of September, 2007, through on or about the [actual date of day before the complainant's fourteenth birthday]*, in Denton County, Texas, the defendant, IVAN LOPEZ-SALAS, did then and there commit two or more acts of sexual abuse namely: Indecency with a Child and/or Aggravated Sexual Assault of a Child against [the complainant], to-wit: with the intent to arouse or gratify the sexual desire of the defendant engage in sexual contact with [the complainant] by touching the genitals of [the complainant] and/or by intentionally or knowingly causing the mouth of [the complainant] to contact the sexual organ of the defendant and/or by intentionally or knowingly causing the penetration of the

31

sexual organ of [the complainant] by the defendant's finger and/or by causing the sexual organ of [the complainant] to contact the sexual organ of the defendant, and *at the time of the commission of each of those acts, the defendant was at least 17 years of age and [the complainant] was a child younger than 14 years of age*, and not the spouse of the defendant, you will find the defendant guilty of Continuous Sexual Abuse of Young Child, as charged in Count I of the indictment.

Unless you so find beyond a reasonable doubt, or if you have a reasonable doubt thereof, you will acquit the defendant.

As to Count II of the Indictment and Count III of the Indictment, you are charged as the law that *the State is not required to prove the exact date alleged in the indictment but may prove the offenses, if any, to have been committed at any time* **on or after** *the 14th birthday of [the complainant] and before both the 17th birthday of [the complainant] and June 26, 2015, the presentment date of the indictment [] after [actual date of the complainant's fourteenth birthday] and prior to June 25, 2015, the presentment date of the indictment.*[6]

## COUNT II

Now, if you find from the evidence beyond a reasonable doubt that on or about the 8th day of June, 2013, in Denton County, Texas, the defendant, IVAN LOPEZ-SALAS, did then and there, intentionally or knowingly cause the penetration of the sexual organ of [the complainant], a child younger than 17 years of age who was

---

[6]There appears to be either missing punctuation or a typo in this sentence, which basically says the same thing twice; it generally describes the earliest date the acts in which Counts Two and Three could have occurred as on or after the complainant's fourteenth birthday and then gives the actual date of her fourteenth birthday. We have noted the omission by the open brackets. Regardless, this minor error does not affect the legality of the charge because, read in context, it is clear that it is instructing the jury that acts charged in those counts must have occurred after the complainant's fourteenth birthday, in contrast to the acts charged in Count One, which must have occurred before her fourteenth birthday. Additionally, we note that the presentment date of the indictment conflicts by one day. This appears to be a typo as well; the indictment in the clerk's record bears a filed date of June 26, 2015.

not the spouse of the defendant, and a person whom the defendant was prohibited from marrying or purporting to marry, by the defendant's finger, you will find the defendant guilty of Sexual Assault, as charged in Count II of the indictment.

Unless you so find beyond a reasonable doubt, or if you have a reasonable doubt thereof, you will acquit the defendant.

## COUNT III

Now, if you find from the evidence beyond a reasonable doubt that on or about the 8th day of June, 2013, in Denton County, Texas, the defendant, IVAN LOPEZ-SALAS did then and there intentionally or knowingly cause the penetration of the sexual organ of [the complainant], a child younger than 17 years of age who was not the spouse of the defendant, and a person whom the defendant was prohibited from marrying or purporting to marry, to contact the sexual organ of the defendant, you will find the defendant guilty of Sexual Assault, as charged in Count III of the indictment.

Unless you so find beyond a reasonable doubt, or if you have a reasonable doubt thereof, you will acquit the defendant.

. . . .

You are instructed that if there is any testimony before you in this case regarding the defendant's having committed crimes, wrongs, or acts other than the offenses alleged against him in the indictment in this case, you cannot consider said testimony for any other purpose unless you find and believe beyond a reasonable doubt that the defendant committed such other crimes, wrongs, or acts, if any, and that such crimes, wrongs, or acts are committed against the child, and even then you may only consider the same in determining the intent of the defendant, the state of mind of the defendant and child, or the previous and subsequent relationship between the defendant and the child, if any, in connection with the offenses, alleged against him in the indictment in this case, and for no other purpose.

You are instructed that each count of the indictment is to be considered independently of the other Counts. You are further instructed if there is any testimony before you in this case regarding the defendant's having committed other Counts in the indictment you

cannot consider said testimony as evidence of guilt in the Count under consideration, unless you find and believe beyond a reasonable doubt that the defendant committed such Count against the child, and even then you may only consider the same in determining the intent of the defendant, the state of mind of the defendant and child, or the previous and subsequent relationship between the defendant and the child, if any, in connection with the offenses, alleged against him in the indictment in this case, and for no other purpose. [Emphasis added.]

Relying on *Price,* 434 S.W.3d at 603–04, appellant argues that the court's charge "effectively destroyed any distinction between the commission of two or more abusive acts that are 30 days or more apart and the commission of the sexual assault of the child 'on or about the 8th day of June[,] 2013.'" But in *Price,* the State had alleged an attempted aggravated sexual assault offense occurring during the same time period as the continuous sexual abuse and then contended on appeal that an attempted aggravated sexual assault could not be an underlying offense for the continuous sexual abuse offense; the court of criminal appeals disagreed, holding that the legislature's intent to permit one punishment for conduct occurring during the enumerated time extends to attempts to commit the predicate offenses. *Id.* at 604, 611.

Here, the charge clearly limits the acts that could be considered as to Count One to those acts occurring before the complainant's fourteenth birthday and the acts that could be considered for Counts Two and Three to those occurring after her fourteenth birthday but before her seventeenth birthday. The complainant testified to her birthdate; described sexual acts—including penile penetration of her vagina—by appellant beginning when she was nine years old

34

and continuing on a weekly basis through at least the year she was in the eighth grade; and testified that up to and including June 2013—several months after her fifteenth birthday—appellant was still penetrating her vaginally with his penis and that she missed her period in June 2013, which is when she discovered her pregnancy. She also testified that the abuse ended when she was fifteen years old. Thus, as charged, the jury could not have convicted appellant for the two sexual assault offenses based on the same underlying conduct as charged in the continuous sexual abuse of a child offense. We overrule appellant's fifth point.

## Conclusion

Having overruled appellant's five points, we affirm the trial court's judgment convicting him of all three counts.

/s/ Terrie Livingston

TERRIE LIVINGSTON
CHIEF JUSTICE

PANEL: LIVINGSTON, C.J.; WALKER, J., and KERRY FITZGERALD (Senior Justice, Retired, Sitting by Assignment).

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: March 30, 2017